1
2
3
4
5
6

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| RIGOBERTO MENDOZA, | ) | 1:06cv0399 LJO DLB |
| | ) | |
| | ) | |
| Plaintiff, | ) | FINDINGS AND RECOMMENDATION |
| | ) | REGARDING SOCIAL SECURITY |
| v. | ) | COMPLAINT |
| | ) | |
| MICHAEL J. ASTRUE, Commissioner | ) | |
| of Social Security, | ) | |
| | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**BACKGROUND**

Plaintiff Rigoberto Mendoza ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for disability insurance benefits ("DIB") and supplemental security income ("SSI") pursuant to Titles II and XVI of the Social Security Act.  The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Magistrate Judge for findings and recommendation to the District Court.

**FACTS AND PRIOR PROCEEDINGS[1]**

Plaintiff filed his applications for SSI and DIB on February 25, 2003, alleging disability since December 24, 1999, due to back injuries.  AR 55-57, 63-70.  128-132, 140-149.  After

---

[1] References to the Administrative Record will be designated as "AR," followed by the appropriate page number.

1   being denied both initially and upon reconsideration, Plaintiff requested a hearing before an

2   Administrative Law Judge ("ALJ").  AR 40-43, 46-49, 50.  On October 14, 2004, ALJ James

3   Ross held a hearing but continued it when Plaintiff indicated that he wanted to retain counsel.

4   AR 250-254.  ALJ Ross held a second hearing on July 28, 2005.  AR 255-270.  He issued a

5   decision denying benefits on September 22, 2005.  AR 12-20.  On February 9, 2006, the Appeals

6   Council denied review.  AR 5-8.

7           Hearing Testimony

8   _____ALJ Ross held a hearing on July 28, 2005, in Fresno, California.  Plaintiff appeared with

9   his attorney, Robert Ishikawa.  An interpreter assisted at the hearing.  AR 255.

10          Plaintiff testified that he was 45 years old at the time of the hearing and did not go to

11  school.  He can read a little in Spanish but not at all in English.  He can speak a little English.

12  AR 260.  Plaintiff last worked in 1999 on a farm doing different kinds of work, including

13  soldering, mechanical work and irrigation work.  AR 260-261.

14          He stopped working in 1999 because he hurt his lower back after picking up heavy metal.

15  AR 262.  The pain travels down both legs, but is worse on the right leg.  AR 262.  He testified

16  that the pain is numbing, throbbing, and constant.  AR 263.  He has tingling in his feet, which get

17  swollen, and needs to change positions.  AR 263.  He estimated that he could be on his feet for

18  about one-half hour before needing to rest, get up again, and walk around.  AR 263.  When his

19  feet swell, he estimated that he could walk two blocks, at most, before needing to rest.  AR 263.

20  Plaintiff testified that his feet swell every time he walks.  AR 264.  Plaintiff estimated that he

21  could sit for about an hour before having pain in his body and needing to change position or lay

22  down.  He lays down during the day.  He can wash the dishes for less than 20 minutes before

23  needing to lay down.  AR 264.  He thought he could lift maybe 20 pounds, a few times.  If he

24  picks up more, the pain would be unbearable.  AR 265.

25          Plaintiff testified that he has not had epidural shots.  AR 266.  He is waiting to have the

26  shots but does not think they will work.  AR 266.  Although he refused surgery before, he has

27  changed his mind because the pain has increased a lot.  He is not able to bear the pain, especially

28

1 when he doesn't have his prescription medication.  AR 266.  He takes Celebrex and Tylenol.  AR

2 266.

3 During the day, he does what he can at home.  He lives with his three children, ages 13, 9

4 and 8, and takes care of them, but his oldest daughter helps him a lot.  He and his wife are

5 separated.  AR 267.  His daughter helps him clean the house and do laundry.  AR 267.  They

6 mostly eat food that is prepared in the microwave.  They live in an apartment so there is no yard

7 work.  He is able to drive a car, but if he drives over 50 minutes, he has a lot of pain.  AR 268.

8 At the end of the hearing, the ALJ indicated that he would keep the record open for 30

9 days so that Plaintiff's counsel could provide him with the Workers' Compensation medical

10 records.  AR 269.

11 <u>Medical Evidence</u>

12 In December 1999, Plaintiff reported that he felt better, but continued to have low back

13 pain.  AR 83.

14 In February 2000, Plaintiff continued to complain of low back pain.  He was able to walk

15 on his toes and heels and squat, but had tenderness along paraspinal muscles L5-S1, on the right

16 more than the left.  P.S. Gill, M.D., diagnosed him with lumbar strain with symptomatic L5

17 radiculopthy.  Plaintiff indicated that massage therapy and home remedies improved his

18 condition.  He refused physical therapy because he was afraid his condition would worsen and he

19 refused pain medication because he trusted home remedies.  Dr. Gill indicated that Plaintiff

20 would be cleared for work after he was seen by a neck specialist.  AR 82.

21 In a letter dated February 18, 2000, Dr. Gill indicated that Plaintiff suffered an injury at

22 work in November 1999.  He had a low back strain without nerve root compression, despite

23 sensory diminishment in his right leg.  AR 87.  He further opined that he expected Plaintiff to

24 make a good recovery over the next four weeks.  For the next four weeks, Plaintiff could work

25 for modified duties, with no lifting over 25 pounds and no excessive bending.  AR 88.

26 On March 17, 2000, Dr. Gill wrote a letter to Plaintiff's worker's compensation carrier.

27 He had been treating Plaintiff for low back strain since the injury in November 1999, and had

28 recently stressed the importance of attending physiotherapy and taking anti-inflammatory

1   medication.  Dr. Gill thought Plaintiff seemed confused, but he indicated that he had not been

2   attending physiotherapy and was not taking his medication.  Plaintiff reported that his symptoms

3   improved somewhat, but he still had some difficulty when lifting heavy objects.  On

4   examination, there was no evidence of a neurological deficit.  Dr. Gill diagnosed a

5   "straightforward muscle strain on the low back" and indicated that he was "finding dealing with

6   [Plaintiff] quite difficult."  Plaintiff did not follow instructions and Dr. Gill explained to him that

7   he could only help him if he followed his treatment.  Dr. Gill referred Plaintiff to physiotherapy

8   again and placed him on modified duties with no lifting over 25 pounds.  AR 85-86.

9   _____From March 2000 through November 2002, chiropractor Steven M. Mamigonian treated

10   Plaintiff for right sciatica and lumbosacral dysfunction.  He completed numerous Physician's

11   Progress Reports for Workers' Compensation and indicated that Plaintiff was disabled from his

12   usual occupation through April 2001.  AR 215-223, 226-231.

13   _____Plaintiff underwent an MRI of his lumbar spine on October 19, 2000.  The most severe

14   changes were at the L4-5 level where there was marked central spinal stenosis and a 4 mm

15   central disc bulge.  This was associated with bilateral neural foraminal stenosis and there

16   appeared to be a moderate compression of the thecal sac.  Nerve root compression was also a

17   consideration.  There was mild to moderate central spinal stenosis at L3-L4, degenerative disc

18   disease at all levels and mild bilateral neural foraminal stenosis at L5-S1.  AR 224-225.

19   _____On March 26, 2001, Plaintiff saw Brian H. Clague, M.D.  He reported that his symptoms

20   were slightly better and that he was not taking any medication.  He complained of pain on

21   bending and lifting, but stated that it cleared when he sat down.  On examination, he had some

22   tenderness in the right paralumbar gutter at L5 and right medial buttock.  Sensation was

23   diminished generally in his right leg, but motor and reflex testing in both legs were normal.  He

24   had some atrophy in his right calf.  Dr. Clague reviewed the October 2000 MRI and opined that it

25   showed severe degenerative changes at L4 with marked stenosis.  He diagnosed chronic L4 disc

26   protrusion with nerve root irritation, changes at the L4 level and symptoms of stenosis.  The

27   chances of this resolving spontaneously were poor.  He could lift perhaps 10 pounds infrequently,

28   bend occasionally and do some walking and standing.  He would have to be retrained for a light

4

1   job if he did not want surgery.  Dr. Clague believed that Plaintiff understood that he would not be

2   active again unless a decompression was performed.  AR 94-97.

3          On May 4, 2001, Dr. Mamigonian opined that Plaintiff was limited to light work, with a

4   prophylactic limitation to work in a standing or walking position, with minimal demands for

5   physical effort.  He indicated that Plaintiff responds best to chiropractic treatment.  AR 210-213.

6   This was based on positive MRI findings, positive straight leg raise and positive Kemps and

7   Valsalvas, guarded gait, motion restriction of the entire lumbosacral region, lumbosacral

8   paravertebral muscle spasms, and motion restriction of the cervical spine with spasms.  AR 210.

9          On June 5, 2001, Plaintiff presented to William J. Johncox, PA, for follow-up evaluation.

10  He complained of low back pain and numbness in his legs.  On examination, he ambulated well.

11  Range of motion testing is his back was somewhat reduced and accompanied by subjective

12  complaints of pain.  Motor testing was 5/5 in all major motor groups in the lower but sensation

13  was decreased in the right lower extremity.  Straight leg raise was negative.  There was

14  tenderness to palpation at L4 to S1 in the midline, right more than left.  PA Johncox discussed

15  the case with Dr. Clague and opined that Plaintiff had low back pain, secondary to L4-5

16  symptomatic degenerative disc disease and spinal stenosis.  Plaintiff refused surgery.  He was

17  precluded from heavy work.  AR 89-91.

18          Plaintiff underwent a Qualified Medical Examination on March 29, 2002, performed by

19  Rolf G. Scherman, M.D.  On examination, Plaintiff sat and walked normally and his back was

20  mildly tender.  There was no pain on straight leg raising and no pain on leg extension.  There was

21  obvious mild atrophy of right quadriceps, as well as slight weakness.  Based on his examination

22  and review of the records, Dr. Scherman noted that his examination was "interesting" because

23  Plaintiff did not have any clinical findings of radicular pain, but had atrophy of the right

24  quadriceps and depressed knee jerk.  This indicated that he had involvement of the L4 nerve root

25  on the right.  He opined that Plaintiff had a significant injury that is now permanent and

26  stationary for no heavy work.  Physical therapy had not helped Plaintiff, and given the radicular

27  symptoms, was not likely to help.  Chiropractic treatment should be stopped.  AR 170-175.

28

1    _____On April 22, 2002, Charles J. Heller, M.D., performed a Qualified Medical Examination.

2    Plaintiff ambulated without a limp and was able to perform heel and toe walk as well as

3    squatting.  There was no tenderness over the lumbosacral spines and no spasm.  Although there

4    were subjective complaints, there were minimal objective findings.  Dr. Heller also reviewed

5    medical records from December 8, 1999, through October 2001.  He opined that Plaintiff had

6    reached maximal medical improvement and that he was permanent and stationary as of May 4,

7    2001.  On a prophylactic basis, Plaintiff could not perform heavy lifting and repetitive bending

8    and stooping.  He further opined that chiropractic treatment should cease immediately and that

9    the only treatment would be over-the-counter medications and continuation of an exercise

10   program.  Surgery was not indicated two and one-half years after the injury.  AR 161-167.

11   _____An October 2, 2002, Sanjay J. Chauhan, M.D. conducted an electrodiagnostic study,

12   which was negative for lumbar radiculopathy.  AR 109-110.

13   _____On October 7, 2002, Dr. Chauhan reviewed Plaintiff's medical records and prepared a

14   supplemental report.  He opined that Plaintiff was limited to light work.  This was an actual as

15   well as prophylactic restriction to prevent further worsening of the disc herniation.  AR 107.

16   _____On February 10, 2003, Dr. Heller reviewed medical records from October 2002.  He

17   opined that chiropractic treatment has been excessive and that no additional chiropractic

18   treatment was needed.  AR 159-160.

19   _____On March 17, 2003, Plaintiff saw Troy Smith, M.D., for a consultive orthopedic

20   examination.  Plaintiff complained of low back pain with right leg pain and numbness.  On

21   examination, he walked without a  limp and could stand on his heels and toes without difficulty.

22   Range of motion in his lumbar spine was slightly limited and straight leg raising was to 80

23   degrees bilaterally without pain.  His right calf measured 2 cm less than the left.  Grip strength

24   was 5/5 bilaterally and motor strength was normal.  Sensation to pinprick was normal.  Dr. Smith

25   diagnosed low back pain secondary to spinal stenosis by MRI.  Plaintiff could not do work that

26   required repeated bending or heavy lifting.  He could lift 50 pounds occasionally and 25 pounds

27   frequently, and could stand and walk six hours out of an eight hour day, with breaks every two

28

1  hours.  He could sit for six hours out of eight and could kneel, squat and climb stairs.  AR 113-

2  117.

3         On April 8, 2003, State Agency physician Carmen E. Lopez, M.D., completed a Physical

4  Residual Functional Capacity Assessment form.  He opined that Plaintiff could occasionally lift

5  and/or carry 20 pounds, 10 pounds frequently, could stand and/or walk about six hours in an

6  eight hour day, and could sit for about six hours in an eight hour day.  He could frequently

7  balance, kneel and crawl and could occasionally climb, stoop and crouch.  AR 118-125.  These

8  findings were affirmed by Alfred Torre, M.D.  AR 125.

9         Plaintiff underwent an MRI of his lumbar spine on March 31, 2005.  The test showed

10  mild to moderate central canal stenosis due to a disc bulge/right protrusion complex at L4-5,

11  moderate bilateral neural foraminal narrowing at L4-5, grade I anterolisthesis of L4 upon L5, and

12  mild to moderate multifactorial central canal stenosis at L3.  AR 126-127.

13         Plaintiff saw Adam J. Brant, M.D., at the Neurosurgical Associates Medical Group, on

14  June 17, 2005.  He complained of a constant dull ache in the midline of his back and frequent

15  radiation of pain into the right buttock and thigh.  He stated that his pain level was 7-8 out of 10

16  during the day with activity.  On examination, motor strength was normal and there were no

17  areas of diminished sensation.  He was able to heel and toe walk about could squat and stand

18  without assistance.  Dr. Brant indicated that Plaintiff had chronic low back pain with right-sided

19  sciatica, with his lower extremity symptoms related to his marked stenosis at L4-5.  Dr. Brandt

20  recommended a course of epidural steroid injections and ordered further imaging tests.  Dr.

21  Brandt opined that if he did not obtain significant relief from the injections, he would be a good

22  candidate for surgery.  AR 128-130.

23         In July 2005, Dr. Brant reported that he had been treating Plaintiff since June 17, 2005,

24  for lumbar disc displacement.  Dr. Brandt declined to state a prognosis pending test results, but

25  indicated that Plaintiff could sit for one hour at a time, for a total of four hours in an eight hour

26  day.  He could be on his feet for 30 minutes at a time, for two hours total.  He could lift and carry

27  5 to 10 pounds frequently, 10 to 15 pounds occasionally.  He could not bend, stoop, squat or

28

1   reach.  Dr. Brandt opined that Plaintiff could "possibly" return to work if he improved with

2   treatment.  AR 238-240.

3   _____In August 2005, Dr. Mamigonian completed a report and indicated he had been treating

4   Plaintiff since March 2000.  He opined that Plaintiff was limited to light work.  He could sit for

5   three to four hours at a time, for a total of three to four hours in an eight hour workday.  He could

6   stand for one to two hours at a time, for a total of one to two hours.  He could lift and carry five

7   pounds frequently, 10 pounds occasionally.  He opined that Plaintiff had these limitations since

8   May 4, 2001.  AR 241-243.

9   ALJ's Findings

10  _____After reviewing the evidence, the ALJ determined that Plaintiff had the severe

11  impairments of mild to moderate central canal stenosis at L3-4 and L4-5, and moderate bilateral

12  foraminal narrowing at L4-5.  AR 16.  He retained the residual functional capacity ("RFC") to

13  occasionally lift up to 20 pounds, 10 pounds frequently, and to sit, stand or walk for six hours in

14  and eight hour day.  He could occasionally stoop, crouch and climb.  Although Plaintiff could not

15  perform his past work, the ALJ applied the Medical Vocational Guidelines ("Grids") and found

16  Plaintiff not disabled.  In applying the Grids, the ALJ found that Plaintiff's nonexertional

17  impairments did not significantly affect his ability to perform a wide range of unskilled light

18  work.  AR 19.

19                              **SCOPE OF REVIEW**

20      Congress has provided a limited scope of judicial review of the Commissioner's decision

21  to deny benefits under the Act.  In reviewing findings of fact with respect to such determinations,

22  the Court must determine whether the decision of the Commissioner is supported by substantial

23  evidence.  42 U.S.C. 405 (g).  Substantial evidence means "more than a mere scintilla,"

24  *Richardson v. Perales*, 402 U.S. 389, 402 (1971), but less than a preponderance.  *Sorenson v.*

25  *Weinberger*, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975).  It is "such relevant evidence as a

26  reasonable mind might accept as adequate to support a conclusion."  *Richardson*, 402 U.S. at

27  401.  The record as a whole must be considered, weighing both the evidence that supports and

28  the evidence that detracts from the Commissioner's conclusion.  *Jones v. Heckler,* 760 F.2d 993,

995 (9th Cir. 1985).  In weighing the evidence and making findings, the Commissioner must

apply the proper legal standards.  *E.g.*, *Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988).

This Court must uphold the Commissioner's determination that the claimant is not disabled if the

Secretary applied the proper legal standards, and if the Commissioner's findings are supported by

substantial evidence.  *See Sanchez v. Sec'y of Health and Human Serv.*, 812 F.2d 509, 510 (9th

Cir. 1987).

### REVIEW

In order to qualify for benefits, a claimant must establish that he is unable to engage in

substantial gainful activity due to a medically determinable physical or mental impairment which

has lasted or can be expected to last for a continuous period of not less than 12 months.  42

U.S.C. § 1382c (a)(3)(A).  A claimant must show that he has a physical or mental impairment of

such severity that he is not only unable to do her previous work, but cannot, considering his age,

education, and work experience, engage in any other kind of substantial gainful work which

exists in the national economy.  *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989).

The burden is on the claimant to establish disability.  *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th

Cir. 1990).

In an effort to achieve uniformity of decisions, the Commissioner has promulgated

regulations which contain, inter alia, a five-step sequential disability evaluation process.  20

C.F.R. §§ 404.1520 (a)-(f), 416.920 (a)-(f) (1994).  Here, the ALJ determined that Plaintiff (1)

had not engaged in substantial gainful activity since the alleged onset of disability;(2) has an

impairment or a combination of impairments that is considered "severe" (mild to moderate

central canal stenosis at L3-4 and L4-5, and moderate bilateral foraminal narrowing at L4-5)

based on the requirements in the Regulations (20 CFR §§ 416.920(b)); (3) does not have an

impairment or combination of impairments which meets or equals one of the impairments set

forth in Appendix 1, Subpart P, Regulations No. 4; (4) cannot perform his past relevant work; but

(5) retains the RFC to perform a significant range of unskilled light work.  AR 19-20.

Here, Plaintiff argues that the ALJ (1) improperly used the Grids; (2) improperly

evaluated the medical evidence; and (3) improperly assessed his credibility.

**DISCUSSION**

A.   Use of Grids

Plaintiff first argues that the ALJ improperly determined that his non-exertional impairments, i.e., his ability to occasionally stoop, crouch or climb, did not significantly affect his ability to perform light work, and therefore should not have applied Rule 202.16.  Instead, Plaintiff argues that the ALJ should have consulted a vocational expert ("VE").  Plaintiff also contends that the ALJ ignored the existence of his pain in assessing his non-exertional impairments.

In general, where a claimant suffers only from exertional limitations, the ALJ may apply the Grids at step five to match the claimant with the appropriate work. *Reddick v. Chater*, 157 F.3d 715, 729 (9th Cir. 1998).  The ALJ may apply the Grids in lieu of taking VE testimony only when the Grids accurately and completely describe the claimant's abilities and limitations. *Id.* (citing *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985)).  If a claimant's non-exertional limitations "significantly limit the range of work" he can perform, mechanical application of the grids is inappropriate and a vocational expert would be needed to describe what, if any, jobs existed in the national economy that the claimant could perform. *Desrosiers v. Secretary of Housing and Health Services*, 846 F.2d 573, 577 (9th Cir. 1988)*.  The determination of whether a non-exertional limitation significantly limits the range of work the claimant is able to perform is left to the ALJ. *Id.*

Here, the ALJ found that Plaintiff could perform light work, and that his non-exertional limitations did not significantly affect his ability to do so.  AR 19.  Plaintiff first seems to argue that the existence of the non-exertional impairments, alone, requires use of a VE.  This is not the case, however.  While significant non-exertional impairments may make reliance on the grids inappropriate, the mere allegation of a non-exertional limitation does not automatically preclude the application of the grids. *Desrosiers v. Secretary of Housing and Health Services*, 846 F.2d 573, 577 (9th Cir. 1988).

It was within the ALJ's province to determine that Plaintiff's limitation to occasional stooping, crouching and climbing did not significantly limit his ability to perform light work.

1  Indeed, although Plaintiff views the evidence as demonstrating otherwise, the overwhelming

2  majority of Plaintiff's doctors, including his treating physicians, indicated that Plaintiff that

3  although Plaintiff could not perform heavy lifting and repeated bending, he could perform light

4  work.[2]  AR 89-91, 94-97, 107, 113-117, 118-125, 161-167, 170-175, 210-213, 241-243.  The

5  ALJ's finding was consistent with this evidence.

6        Moreover, by definition, the ability to perform light work would not be significantly

7  impacted by a limitation to occasional stooping, crouching and climbing.  Pursuant to SSR 83-

8  14, "to perform substantially all of the exertional requirements of most sedentary and light jobs, a

9  person would not need to crouch and would need to stoop only occasionally (from very little up

10  to one-third of the time, depending on the particular job)."  Plaintiff's limitation to occasional

11  stooping and crouching therefore does not significantly impact the occupational base for light

12  work.  Similarly, Plaintiff's limitation to occasional climbing does not "significantly limit the

13  range of work" he can perform.  SSR 83-10.

14        Insofar as Plaintiff argues that the ALJ improperly rejected his pain testimony, that issue

15  will be discussed below.

16  B.     Physicians' Opinions

17        Next, Plaintiff argues that the ALJ improperly assessed the physicians' opinions.

18  Specifically, he contends that the ALJ improperly relied on opinions formed in his Workers'

19  Compensation case and improperly rejected his treating physicians' opinions.

20        1.     *Opinions Rendered in Plaintiff's Workers' Compensation Case*

21        Plaintiff believes that the ALJ incorrectly found that he was capable of light work by

22  relying on opinions that were prepared for the Workers' Compensation system.  He contends that

23  those doctors, including Dr. Scherman, Dr. Clague and Dr. Chahuan, determined that Plaintiff

24  was limited to light work for Workers' Compensation purposes, and that these findings do not

25  translate into a finding that Plaintiff can perform light work under the Social Security system.  He

26

27

28     [2] Plaintiff contention that the ALJ improperly translated "light work" in the Workers' Compensation setting
into "light work" under the Social Security system is discussed below.

further contends that these opinions actually support a finding of disability under the Social

Security framework.

Plaintiff correctly notes that the categories of work under the Social Security disability

scheme and Workers' Compensation scheme are "measured quite differently." *Desrosiers v.*

*Sec'y of Health and Human Serv.*, 846 F.2d 573, 576 (9th Cir. 1988).  "They are differentiated

primarily by step increases in lifting capacities."  *Id.*  However, "[a]lthough [Workers'

Compensation status is] not conclusive in a social security case, the ALJ is entitled to draw

inferences logically flowing from the evidence."  *Macri v. Chater*, 93 F.3d 540, 544 (9th Cir.

1996) (citing *Desrosiers,* 846 F.2d at 576).

In assessing Plaintiff's RFC, the ALJ first correctly pointed out that "the medical opinion

is almost unanimous that the claimant was precluded from heavy work and repetitive bending

after his accident."  AR 18.  In support of this statement, he cites the findings of Dr.

Castonguay/Dr. Gill, Dr. Clague, Dr. Scherman, Dr. Heller, Dr. Chauhan and Dr. Smith.  AR 18.

He continued, "[t]hese opinions, from board-certified specialists, are based on well-documented

examinations and are entitled to great weight."  AR 18.

Plaintiff does not disagree with the ALJ's adoption of these opinions in support of his

finding that Plaintiff could not perform heavy work and repetitive bending.  Instead, he contends

that these opinions, which found Plaintiff capable of light work under Workers' Compensation

standards, should equate to a finding of disability under the Social Security system.[3]

The ALJ's RFC finding that Plaintiff can perform light work therefore adopts the

findings of the above examining physicians that Plaintiff could not perform heavy work or

repetitive bending.  In his assessment, though, the ALJ adopted these opinions for only this

proposition, i.e., that Plaintiff could not perform heavy work or repetitive bending.  The ALJ

need not believe everything a physician sets forth, and may accept all, some, or none of the

physician's opinions. *Magallanes v. Bowen*, 881 F.2d 747, 753-754 (9th Cir. 1989).  As support

for the remainder of his RFC, the ALJ relied on the opinions of Dr. Smith, the consultive

---

[3] According to Plaintiff, these opinions support a finding that he is capable of only sedentary work, which results in a finding of disability under Rule 201.17.

examiner, and Dr. Lopez, the State Agency physician, both of whom rendered their opinion in the context of a Social Security action.  A State Agency non-examining physician's reports may serve as substantial evidence where they are supported by other evidence in the record.  *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 600 (9th Cir. 1999).

Insofar as Plaintiff points to certain aspects of the opinions that support a finding of disability, his argument fails.  For example, Plaintiff points to Dr. Clague's limitation to lifting 10 pounds infrequently, bending occasionally and "some" walking or standing, but as explained above, the ALJ did not adopt this aspect of his opinion and instead properly relied on Dr. Smith and Dr. Lopez to support his RFC finding.  The ALJ is responsible for resolving conflicts in the medical evidence.  *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989).  When evidence reasonably supports either confirming or reversing the ALJ's decision, we may not substitute our judgment for that of the ALJ.  *Batson v. Comm'r of Soc. Sec'y Admin.,* 359 F.3d 1190, 1196 (9th Cir. 2004).

    2.    *Treating Physicians' Opinions*

Plaintiff next argues that the ALJ improperly rejected the opinions of Dr. Mamigonian and Dr. Brant, Plaintiff's treating physicians.

The opinions of treating doctors should be given more weight than the opinions of doctors who do not treat the claimant.  *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir.1998); *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir.1995).  Where the treating doctor's opinion is not contradicted by another doctor, it may be rejected only for "clear and convincing" reasons supported by substantial evidence in the record.  *Lester*, 81 F.3d at 830.  Even if the treating doctor's opinion is contradicted by another doctor, the ALJ may not reject this opinion without providing "specific and legitimate reasons" supported by substantial evidence in the record.  *Id.* (quoting *Murray v. Heckler*, 722 F.2d 499, 502 (9th Cir.1983)).  This can be done by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings.  *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir.1989).  The ALJ must do more than offer his conclusions.  He must set forth his own

interpretations and explain why they, rather than the doctors', are correct.  *Embrey v. Bowen*, 849

F.2d 418, 421-22 (9th Cir.1988).

Here, the ALJ adopted the opinions of the consultive examiner and State Agency

physician over the opinions of two treating sources.  In *Orn v. Astrue,* ___F.3d ___ (9th Cir.

2007)(2007 WL 2034287), the Ninth Circuit reiterated and expounded upon its position

regarding the ALJ's acceptance of the opinion an examining physician over that of a treating

physician.  "When an examining physician relies on the same clinical findings as a treating

physician, but differs only in his or her conclusions, the conclusions of the examining physician

are not '"substantial evidence."'  *Orn,* at *5; *Murray*, 722 F.2d at 501-502.  "By contrast, when

an examining physician provides 'independent clinical findings that differ from the findings of

the treating physician' such findings are 'substantial evidence.'" *Orn*, at *5; *Miller v. Heckler*,

770 F.2d 845, 849 (9th Cir.1985).  Independent clinical findings can be either (1) diagnoses that

differ from those offered by another physician and that are supported by substantial evidence, *see*

*Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir.1985), or (2) findings based on objective medical

tests that the treating physician has not herself considered, *see Andrews*, 53 F.3d at 1041.

In rejecting Dr. Mamigonian's opinions, the ALJ explained as follows[4]:

> Limited weight is given to Dr. Mamigonian's certifications that the claimant was disabled
> from March 2000 through May 4, 2001, since they were given under the Worker's
> Compensation standards and referred to the claimant's inability to return to his past work.
> No weight is given to the August 2005 certification, since it is unsupported by current
> treatment notes and appears to be given as an accommodation to the claimant.  Although
> Dr. Mamigonian stated that he had treated the claimant from March 2000 through August
> 10, 2005, immediately prior to the certification, the treatment notes supplied after the
> hearing ended in November 2002.

AR 18.

In the certifications from March 2000 to May 4, 2001, Dr. Mamigonian checked the box

indicating that Plaintiff was to "remain off work."  AR 215-223, 226-231, 234-235.  While the

forms listed subjective and objective findings as well as treatment plans, they did not set forth

Plaintiff's abilities.  Additionally, as the ALJ noted, the forms were completed in the course of

---

[4] Although the ALJ did not raise this issue in his decision, the Court notes that Dr. Mamigonian is
chiropractic doctor and his opinion is therefore not entitled to the weight given to an acceptable medical source.  20
C.F.R. § 404.1513.

Plaintiff's Workers' Compensation treatment, where the forms were used mainly in the context of assessing Plaintiff's ability to return to the position in which he was injured.  As such, the repeated findings that Plaintiff was to "remain off work" did not assist the ALJ in assessing Plaintiff's functional capacity.  Interestingly, on April 23, 2001, Dr. Mamigonian indicated that Plaintiff was "physically able to participate in vocational rehabilitation services."  AR 214. Similarly, on May 4, 2001, Dr. Mamigonian opined that although Plaintiff could not return to his past work, he could "perform another line of work."  AR 210-213.

As to Dr. Mamigonian's August 2005, assessment, he again opined that although Plaintiff could not return to his usual work, he could return to "light work."  AR 243.  While his definition of "light work" may not be the same as "light work" under the Social Security system, the ALJ is allowed to draw inferences from the fact that Dr. Mamigonian found that Plaintiff was able to perform work.  The ALJ rejected Dr. Mamigonian's specific limitations, i.e., Plaintiff could sit for three to four hours total, could be on his feet for one to two hours total, and could lift and carry five pounds frequently and ten pounds infrequently, because it was not supported by current treatment notes and appeared to be given as an accommodation to Plaintiff.  Indeed, as the ALJ noted, the treatment notes supplied after the hearing end in November 2002.  AR 18.

As a contradicted[5] opinion, the ALJ was required to set forth specific and legitimate reasons for rejecting Dr. Mamigonian's opinion.  As set forth above, the ALJ satisfied his burden.

In rejecting Dr. Brant's opinion, the ALJ explained:

Little weight is given to the July 2005 assessment of the claimant's functioning, completed by Dr. A. Brant; it is unsupported by examining records and is based on a treating relationship that began the month before.  Dr. Brant's limitation of the claimant to a narrow range of part-time sedentary work is also contradicted by all other medical opinions of record.

AR 18.

As the ALJ noted, Dr. Brant appears to have seen Plaintiff only one time prior to his July 18, 2005, report.  Plaintiff presented to Dr. Brant on June 17, 2007, the month prior, for a

---

[5] Interestingly, both Dr. Scherman and Dr. Chauhan found that chiropractic care was "contraindicated" and could lead to further injury.  AR 107, 174.  Dr. Heller found it to be "excessive."  167.

consultation regarding his lumbar disc herniation.  AR 128.  During the examination, he was able to heel and toe walk and squat and stand without assistance.  Range of motion in his lumbar spine was normal, although straight leg raising was positive on the right at thirty degrees.  Dr. Brandt recommended a course of epidural steroid injections and ordered further imaging tests. AR 128-131.  Based on this examination, Dr. Brant opined in his July 18, 2005, questionnaire that Plaintiff could sit for one hour at a time, for a total of four hours in an eight hour day, could be on his feet for 30 minutes at a time, for two hours total.  He could lift and carry 5 to 10 pounds frequently, 10 to 15 pounds occasionally.  He could not bend, stoop, squat or reach.  Dr. Brandt opined that Plaintiff could "possibly" return to work if he improved with treatment and declined to state a prognosis pending test results.  AR 238-240.

The ALJ was correct in questioning this assessment based on a lack of supporting treatment notes and a limited treating relationship.  A lack of supporting clinical findings is a valid reason for rejecting a treating physician's opinion.  *Magallenes,* 881 F.2d at 751.  Moreover, contrary to Plaintiff's belief, the ALJ was entitled to examine the length of Plaintiff's treating relationship with Dr. Brant.  20 C.F.R. 404.1527(d)(2)(i)-(ii); *Orn*, at *6.

Insofar as the ALJ accepted Dr. Smith's opinion over that of Drs. Mamigonian and Brant, Dr. Smith's opinion constituted substantial evidence because it was based on independent clinical findings.  He conducted his own examination and found no tenderness to percussion of the entire lumbar area, straight leg raising to 80 degrees bilaterally without pain, and slight limitation in range of motion in the lumbar spine.  AR 114-115.  There was no evidence of joint pain, swelling, tenderness or inflammation, and Plaintiff walked without evidence of a limp.  AR 114-115.  These objective findings differ from those of Drs. Mamigonian and Brant and therefore provide independent clinical findings to support Dr. Smith's opinion.

C.    Plaintiff's Subjective Complaints

Finally, Plaintiff contends that the ALJ improperly assessed his allegations of pain.

The ALJ is required to make specific findings assessing the credibility of plaintiff's subjective complaints.  *Cequerra v. Secretary of HHS*, 933 F.2d 735 (9th Cir. 1991).  "An ALJ is not 'required to believe every allegation of disabling pain' or other non-exertional impairment,"

1    *Orn v. Astrue*, ___F.3d___, 2007 WL 2034287, *9 (9th Cir. 2007) (citation omitted).  In rejecting

2 the complainant's testimony, "the ALJ must identify what testimony is not credible and what

3 evidence undermines the claimant's complaints."  *Lester v. Chater,* 81 F.3d 821, 834 (9th Cir.

4 1996) (quoting *Varney v. Secretary of Health and Human Services,* 846 F.2d 581, 584 (9th Cir.

5 1988)).  Pursuant to Ninth Circuit law, if the ALJ finds that the claimant's testimony as to the

6 severity of her pain and impairments is unreliable, the ALJ must make a credibility determination

7 with findings sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily

8 discredit claimant's testimony.  *Thomas v. Barnhart,* 278 F.3d 947, 958 (9th Cir. 2002).  Where

9 the ALJ does not find "'affirmative evidence' that the claimant was a malingerer, the reasons for

10 rejecting the claimant's testimony must be clear and convincing."  *Orn,* at *9.

11      "The ALJ may consider at least the following factors when weighing the claimant's

12 credibility: '[claimant's] reputation for truthfulness, inconsistencies either in [claimant's]

13 testimony or between [her] testimony and [her] conduct, [claimant's] daily activities, [her] work

14 record, and testimony from physicians and third parties concerning the nature, severity, and effect

15 of the symptoms of which [claimant] complains."  *Id.* (citing *Light v. Soc. Sec. Admin.,* 119 F.3d

16 789, 792 (9th Cir. 1997).  "If the ALJ's credibility finding is supported by substantial evidence in

17 the record, we may not engage in second-guessing."  *Id.*

18      In assessing Plaintiff's subjective complaints, the ALJ first noted that his complaints were

19 not supported by the medical evidence.  While this is one factor that may be considered, the

20 objective medical evidence does not necessarily render his testimony incredible.  To the contrary,

21 the objective evidence demonstrates that Plaintiff has a severe back impairment that could

22 possibly produce the limitations and pain he alleges.  Although his actual limitations may not be

23 as severe as alleged based on the physicians' opinions above, the ALJ should not have relied on

24 the medical evidence as a factor in Plaintiff's credibility analysis.

25      For example, an October 2001 MRI showed marked central spinal stenosis at L4-5 and a

26 4 mm central disc bulge, bilateral neural foraminal stenosis and moderate compression of the

27 thecal sac.  The test also revealed mild to moderate central spinal stenosis at L3-L4, degenerative

28 disc disease at all levels and mild bilateral neural foraminal stenosis at L5-S1.  AR 224-225.  A

March 2005, MRI yielded similar results, and showed mild to moderate central canal stenosis

due to a disc bulge/right protrusion complex at L4-5, moderate bilateral neural foraminal

narrowing at L4-5, grade I anterolisthesis of L4 upon L5, and mild to moderate multifactorial

central canal stenosis at L3.  AR 126-127.  Additionally, numerous physicians noted nerve

involvement in the right leg and/or decreased sensation in the right leg, as well as atrophy of the

right quadriceps and calf.  AR 89-91, 94-97, 113-117, 170-175.  In fact, Dr. Scherman found

Plaintiff's examination "interesting" because he did not have any clinical findings of radicular

pain, but had atrophy of the right quadriceps and depressed knee jerk, which indicated

involvement of the L4 nerve root on the right.  AR 174.

The ALJ next explained that Plaintiff takes only non-narcotic pain medications and that

this suggests that his testimony about his pain symptoms is exaggerated.  AR 18.  He also

explains that Plaintiff refused physical therapy and declined epidural injections and surgery.  AR

19.  The ALJ concluded that this suggested that Plaintiff did not have substantial pain symptoms

prior to 2005.[6]  "In the case of a complaint of pain, such failure [to seek treatment or follow

prescribed treatment] may be probative of credibility, because a person's normal reaction is to

seek relief from pain, and because modern medicine is often successful in providing some

relief.." *Orn*, at *11.   According to early medical records, Plaintiff did not want to take pain

medication because he trusted "home remedies" and these improved his condition.  AR 82.

However, as Plaintiff's pain worsened, it seems that Plaintiff would have tried additional

treatment.  *Fair v. Bowen*, 885 F.2d 527, 603 (9th Cir. 1989) (a claimant's failure to assert a good

reason for failing to seek treatment or follow a prescribed course of treatment, or a finding by the

ALJ that the proffered reason is not believable, can cast doubt on the sincerity of the claimant's

pain testimony).  The ALJ was entitled to take this fact into consideration in assessing Plaintiff's

testimony.

Plaintiff attempts to explain his decision not to take narcotic pain medications by

suggesting that he was able to control his pain by limiting his activity.  He cites Dr. Scherman's

explanation that Plaintiff "had symptoms with more vigorous activity, such as walking for over

---

[6] Plaintiff's date last insured was December 31, 2003, and he had to prove disability prior to this date.

an hour." AR 173. However, Dr. Scherman also noted that when surgery was suggested four to five months prior, Plaintiff was "having insufficient pain to take pain medicine, " which seems to support the ALJ's inference. AR 173. Moreover, Plaintiff testified at the hearing that his pain was now constant and unbearable, but he was still not taking pain medication. AR 263, 266.

Finally, the ALJ examined Plaintiff's daily activities, explaining that Plaintiff was able to drive one hour to the hearing and is the primary caretaker for three minor children. AR 19. "[T]he mere fact that a plaintiff has carried on certain daily activities ... does not in any way detract from her credibility as to her overall disability." *Orn,* at *12. If a claimant is able to spend a substantial part of his day engaged in pursuits involving the performance of physical functions that are transferable to a work setting, a specific finding as to this fact may be sufficient to discredit a claimant's allegations. *Morgan v. Commissioner of Social Sec. Admin.,* 169 F.3d 595, 600 (9th Cir. 1999). The ALJ must make "specific findings relating to [the daily] activities" and their transferability to conclude that a claimant's daily activities warrant an adverse credibility determination. *Orn,* at *13.

At the hearing, Plaintiff testified that he does what he can at home during the day. His oldest daughter, age 13, helps him take care of his two other children, ages 9 and 8. AR 267. His daughter helps him clean the house and do laundry. AR 267. They mostly eat food that is prepared in the microwave. They live in an apartment so there is no yard work. He is able to drive a car, but if he drives over 50 minutes, he has a lot of pain. AR 268. Based on this testimony, the ALJ determined that Plaintiff was not as disabled as alleged.

The Court agrees that the ability to drive for one hour, with pain, and the ability to "take care" of three minor children does not necessary translate into the ability to perform work activities. Plaintiff testified that his oldest daughter helps him take care of his other two children, who are not infants or toddlers, and helps him with the laundry and cleaning. From this testimony, the ALJ cannot reasonably conclude that Plaintiff is "able to spend a substantial part of his day engaged in pursuits involving the performance of physical functions that are transferrable to a work setting." *Morgan*, 169 F.3d at 600.

1    It therefore appears that two of the three factors used in the credibility analysis were used

2    in error, rendering the analysis unsupported by substantial evidence.  Section 405(g) of Title 42

3    of the United States Code provides: "the court shall have the power to enter, upon the pleadings

4    and transcript of the record, a judgment affirming, modifying, or reversing the decision of the

5    Secretary, with or without remanding the cause for a rehearing."  In social security cases, the

6    decision to remand to the Commissioner for further proceedings or simply to award benefits is

7    within the discretion of the court.  *McAllister v. Sullivan*, 888 F.2d 599, 603 (9th Cir. 1989).  "If

8    additional proceedings can remedy defects in the original administrative proceedings, a social

9    security case should be remanded.  Where, however, a rehearing would simply delay receipt of

10   benefits, reversal and an award of benefits is appropriate."  *Id.* (citation omitted); *see also Varney*

11   *v. Secretary of Health & Human Serv.*, 859 F.2d 1396, 1399 (9th Cir.1988) ("Generally, we

12   direct the award of benefits in cases where no useful purpose would be served by further

13   administrative proceedings, or where the record has been thoroughly developed.").

14   Given the severity of the medical record, the Court finds it necessary to remand this

15   action for a proper credibility analysis.  If a proper analysis leads to other issues that should be

16   examined, i.e., pain as a non-exertional impairment in relation to use of the Grids, these issues

17   should be addressed, as well.

18   **RECOMMENDATION**

19   Based on the foregoing, the Court finds that the ALJ's decision is not supported by

20   substantial evidence or based proper legal standards.   Accordingly, the Court RECOMMENDS

21   that Plaintiff's appeal from the administrative decision of the Commissioner of Social Security

22   be GRANTED and that JUDGMENT be entered for Plaintiff Rigoberto Mendoza, and against

23   Defendant Jo Anne B. Barnhart.  The Court further RECOMMENDS that the action be

24   REMANDED for further proceedings consistent with this opinion.

25   These findings and recommendations will be submitted to the Honorable Lawrence J.

26   O'Neill, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l).  Within fifteen (15) days after

27   being served with these findings and recommendations, the parties may file written objections

28   with the court.  The document should be captioned "Objections to Magistrate Judge's Findings

20

1   and Recommendations."  The parties are advised that failure to file objections within the

2   specified time may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951

3   F.2d 1153 (9th Cir. 1991).

4       IT IS SO ORDERED.

5   **Dated:     September 25, 2007**                    _____ **/s/ Dennis L. Beck**_____
                                                        UNITED STATES MAGISTRATE JUDGE